IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| TERRI E. G.,[1] | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| vs. | )   Case No. 3:21-cv-447-DWD |
| | ) |
| COMMISSIONER OF SOCIAL SECURITY, | ) |
| | ) |
|     Defendant. | ) |

**MEMORANDUM & ORDER**

**DUGAN, District Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423. For the following reasons, the final agency decision is due to be affirmed.

**Procedural History**

Plaintiff applied for DIB on October 19, 2011, alleging a disability onset date of June 27, 2011. After holding an evidentiary hearing, an Administrative Law Judge ("ALJ") denied the application on February 28, 2014. The Appeals Council denied Plaintiff's request for review on March 30, 2015, making the ALJ's decision the final agency decision subject to judicial review. Plaintiff exhausted administrative remedies and filed a timely complaint with the Court. By joint motion of the parties, the case was

---

[1] In keeping with the Court's practice, Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

remanded to the Commissioner for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g) on March 3, 2016. After a new evidentiary hearing, an ALJ again denied Plaintiff's application for benefits on December 8, 2016. Plaintiff again filed a timely complaint with this Court which resulted in a second reversal and remand to the Commissioner for reconsideration on August 18, 2018. An ALJ held a third evidentiary hearing and again denied Plaintiff's application for benefits on March 28, 2019. Plaintiff again filed a timely complaint with this Court. On August 14, 2020, on the Commissioner's motion, the Court remanded the case for reconsideration but warned the Commissioner that he would have only one more opportunity to get it right before the Court made a direct award of benefits. After holding an evidentiary hearing, an ALJ denied Plaintiff's application for benefits for the fourth time on January 4, 2021. Plaintiff has exhausted administrative remedies and timely filed a complaint with this Court seeking judicial review of the Commissioner's decision. (Doc. 1).

## Applicable Legal Standards

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have

a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. § 404.1520.

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. A negative answer at any step, other than at step 3, precludes a finding of disability. The claimant bears the burden of proof at steps 1–4. Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

It is important to recognize that the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Accordingly, the Court is not tasked with determining whether or not Plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the Court takes the entire administrative record into consideration but does *not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v.*

*Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; the Court does not act as a rubber stamp for the Commissioner. See *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## **The Decision of the ALJ**

The ALJ followed the five-step analytical framework described above. At step one, he determined that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date. She was 51 years old on the alleged onset date. At step two, the ALJ found that Plaintiff has the following severe impairments: obstructive sleep apnea, restless legs syndrome ("RLS"), obesity, status-post coronary artery bypass graft, fibromyalgia, seronegative rheumatoid arthritis ("RA"), osteoarthritis in the bilateral hands, status-post arthrodesis of the left first carpometacarpal (CMC) joint, left carpal tunnel syndrome, degenerative arthritis in the bilateral knees, diabetes mellitus, diabetic peripheral neuropathy, and hypertension. (Tr. 2098). The ALJ also found that Plaintiff has the following nonsevere impairments: bilateral trochanteric bursitis, neurocardiogenic syncope, benign paroxysmal positional vertigo ("BPPV"), gastritis, fatty liver, right plantar fasciitis, status post plantar fasciotomy, status-post avulsion fracture of the right calcaneus, psychophysiological insomnia, generalized anxiety disorder, and major depressive disorder. (Tr. 2098).

At step three, the ALJ found that Plaintiff does not have any impairments or combination of impairments that meet any of the listings. The ALJ determined that Plaintiff has only a mild limitation in her ability to understand, remember, or apply information. (Tr. 2102). The ALJ determined that Plaintiff has only mild limitation in her

ability to adapt or manage herself. (Tr. 2103). He found that Plaintiff has a mild limitation in her ability to interact with others. (Tr. 2102). The ALJ also concluded that Plaintiff has only a mild limitation in her ability to concentrate, persist, or maintain pace. (Tr. 2102).

Before proceeding to step four, the ALJ found that Plaintiff has the residual functional capacity ("RFC") to perform a range of sedentary work with the following limitations:

> She could lift and carry 10 pounds occasionally and less than 10 pounds frequently. She could sit 6 hours total, and stand and walk 2 hours in total in an 8-hour workday. She could push and pull as much as she could lift and carry. The claimant could occasionally balance. She could frequently handle and finger bilaterally. She should have avoided concentrated exposure to work at unprotected heights, around dangerous moving machinery, or the operation of motor vehicle as part of her job duties.

(Tr. 2105).

At step four, the ALJ relied on the testimony of a vocational expert ("VE") to find that Plaintiff could perform her past relevant work as a library director. (Tr. 2119–20). Accordingly, at step five, the ALJ found that Plaintiff was not disabled. (Tr. 2120).

## The Evidentiary Record

Plaintiff is married and has two children in their thirties. (Tr. 1073–74). She graduated high school, took some college courses, but did not graduate from college. (Tr. 2144). Plaintiff reports that she prepares her own meals, does laundry and light cleaning, shops once a week, reads, and knits, although joint pain limits her knitting at times. (Tr. 197–99). She attends church weekly. (Tr. 1575). She exercises by doing Tai Chi and walking laps in a swimming pool to help manage her pain. (Tr. 1072).

Plaintiff was employed as a library director for nearly 16 years. (Tr. 1685).

However, in 2011, she pled guilty to felony charges related to misappropriated library funds. (Tr. 871). On Plaintiff's attorney's request, Dr. Rachel S. Darken wrote a letter to Plaintiff's judge to explain the common side effects of the medications Plaintiff was taking to manage her RLS. (Tr. 932–33). According to the letter, the two medications Plaintiff was taking for her RLS, ropinirole and pramipexole, may cause patients taking those medications to develop impulse control disorders such as pathological gambling or compulsive shopping. (Tr. 932). Plaintiff claims that these two medications caused the impulsive behavior that led to her felony charges. (Tr. 1684, 2151). Plaintiff discontinued those medications in August 2011. (Tr. 2152). Plaintiff reported that her compulsive behaviors did not continue after she stopped taking ropinirole and pramipexole. (Tr. 2157). As the ALJ noted, there is no indication that Plaintiff was ever actually diagnosed with an impulse disorder.

During her last couple of years at the library, Plaintiff owned a yarn store where she worked an additional 25 hours per week. (Tr. 2147–48). At the most recent evidentiary hearing, Plaintiff testified that she began reducing her hours at the yarn store around the time she was fired from the library in June 2011. (Tr. 2149). But in August and September 2011, after being fired from the library, Plaintiff told her therapist that she was working at her yarn store "a lot." (Tr. 293–95). Plaintiff eventually sold the store in 2012. (Tr. 2149). She also told her therapist in September 2011 that she was tutoring children. (Tr. 95). However, she testified at one of her prior evidentiary hearings that she was only tutoring children while she was still employed by the library. (Tr. 1684). But at her most recent evidentiary hearing, Plaintiff testified that she was not engaged in any volunteer work

6

while employed at the library. (Tr. 2150–51).

Plaintiff reports that she began working part-time at her cousin's newspaper in 2013. (Tr. 2149–50). She was not a paid employee and did not have to go to work if her arthritis or fibromyalgia were bothering her on a particular day. (Tr. 2157–58). During one of the prior evidentiary hearings, Plaintiff testified that she would typically work seven to eight hours per week at the newspaper. (Tr. 1577). She reported in 2016 that she was no longer regularly working at the newspaper due to her pain. (Tr. 838, 1414).

Prior to her alleged disability onset date, Plaintiff was being treated for lupus, gastritis, diabetes, and fibromyalgia. (Tr. 311–28). Following her disability onset date, Plaintiff saw a therapist for several months in 2011. (Tr. 2154). After she was released from therapy, Plaintiff continued taking medication for anxiety, depression, and her other mental health conditions. (Tr. 2154). In July 2011, she reported that sleep was "refreshing" and that her insomnia had been well controlled "until her recent stressors." (Tr. 403). In 2012, she reported that her insomnia was well controlled and in 2013 credited her improved sleep to her legal problems having been resolved. (Tr. 576, 871, 892, 901). She also reported that her insomnia was well controlled in 2016. (Tr. 1415, 1430). From 2013–2016, Plaintiff's scores on the Epworth sleepiness scale ranged from 13/24 to 10/24, improving at times and worsening at other times. (Tr. 871, 892, 900, 1414, 1434, 1438, 1446, 1451). But she consistently reported that she did not fall asleep while driving and that CPAP use improved her sleep and helped her feel better in the morning.

Numerous mental status examinations consistently produced normal findings. (Tr. 305, 309, 355, 461, 538, 594, 641, 643–44, 647, 650, 653, 711, 742, 745, 748, 752, 756, 990,

995, 1000, 1312, 1336, 1344, 1347, 1362, 1365, 1369, 1412, 1444, 1912, 1919, 1929, and 1938). The medical evidence related to Plaintiff's pain complaints also often showed normal findings. An x-ray of Plaintiff's hip in 2011 was unremarkable. (Tr. 637). An x-ray of Plaintiff's hands and wrists in 2013 showed mild osteoarthritis but no evidence of inflammatory arthritis. (Tr. 868). On exam, physicians found mild tenderness to palpation in some of her joints at times but no swelling or tenderness in other joints and at other times in 2014 and 2016. (Tr. 1497, 1502, 1517, 1520, 1524, 1527). In 2016, Plaintiff was seen for pain management, and she stated that her pain symptoms began more than 10 years earlier with no inciting event. (Tr. 1424). She also reported that moderate activity was best for her pain. (Tr. 1409, 1424).

Three agency medical consultants reviewed Plaintiff's medical records. Dr. Kuester concluded that Plaintiff suffers from depression and anxiety (Tr. 549–51). She also concluded that Plaintiff has a mild limitation in activities of daily living and moderate limitations in social functioning and maintaining concentration, persistence, and pace. (Tr. 556). In her notes, Dr. Kuester cited other medical records that indicated Plaintiff had been previously diagnosed with depression and anxiety but presented as well-groomed and euthymic with a normal mood and affect, intact memory, judgment, and insight. (Tr. 558). Dr. Kuester concluded that Plaintiff could perform simple tasks but should not be required to interact extensively with the public. (Tr. 562). Dr. Brister's evaluation largely affirms Dr. Kuester's opinion while adding no new information as to Plaintiff's mental functioning. (Tr. 691–93). Dr. Logan's opinion also simply affirms the earlier findings as to Plaintiff's mental functioning. (Tr. 696).

8

## Analysis

Plaintiff makes three arguments in support of reversing the Commissioner's decision. First, Plaintiff argues that the ALJ erred in evaluating her mental impairments. Second, Plaintiff argues that the ALJ erred in evaluating her subjective symptoms. Third, Plaintiff argues that the ALJ erred in relying on the outdated opinions of some agency consultants. The Court considers each argument in turn.

### A.    Mental Impairments

As a preliminary matter, Plaintiff begins with a discussion of evidence related to her felony conviction. Under S.S.R. 83-21, an ALJ may not consider any physical or mental impairment that arose or was aggravated due to the claimant's commission of a felony. Plaintiff argues that her conditions pre-existed the felony she committed in 2011 and thus may be considered by the ALJ. However, Plaintiff's concern about this issue is unnecessary, as the ALJ specifically declined to exclude any evidence under this provision. (Tr. 2098). Accordingly, the Court will evaluate the ALJ's decision without concern for evidence potentially excludable under S.S.R. 83-21.

Plaintiff argues that the ALJ improperly assessed Plaintiff's truthfulness, particularly as to her testimony about her work at the library and her yarn store leading up to her disability onset date. When evaluating an individual's symptoms, the ALJ is not permitted to "assess an individual's overall character or truthfulness" but should instead "focus on whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms." S.S.R. 16-3p. While avoiding wholesale conclusions about the claimant's character, the ALJ must

weigh conflicting evidence and make credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413–14 (7th Cir. 2008) (citing *Brewer v. Chater*, 103 F.3d 1384, 1392 & n.11 (7th Cir. 1997)). When reviewing an ALJ's credibility determination, the court must decide only "whether the ALJ's determination was reasoned and supported." *Id.* at 413. Here, the Court did not find any language in the decision suggesting that the ALJ had made sweeping conclusions as to Plaintiff's character. Rather, the ALJ noted inconsistencies in Plaintiff's testimony. As discussed below, the ALJ's decision to reject some of Plaintiff's statements regarding her symptoms was thoroughly reasoned and supported by substantial evidence.

Plaintiff takes issue with the ALJ's rejection of the opinions of the agency consultants who were the only reviewing doctors to provide a direct evaluation of Plaintiff's mental health functioning: Dr. Kuester, Dr. Brister, and Dr. Logan. Plaintiff argues that because he rejected these opinions, the ALJ's mental RFC opinion lacks any expert opinion support. (Doc. 23 at 6 (citing *Lawonda P. v. Kijakazi*, No. 20-cv-2573, 2021 WL 3418847, at *5 n.6 (N.D. Ill. Aug. 5, 2021) (noting that the ALJ's rejection of the only expert mental health opinion on record undermined the Commissioner's position))). The Commissioner concedes that these were the only medical opinions as to Plaintiff's mental functioning but argues that the ALJ properly found them unsupported by the medical evidence. The ALJ is only required to incorporate into his RFC and hypothetical those limitations supported by the medical record. *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014).

Substantial evidence supports the ALJ's conclusion that the limitations described

10

by Dr. Kuester are not supported by the medical record. As the ALJ observed, the opinions themselves lack an adequate explanation of Dr. Kuester's conclusions. Dr. Kuester offered very little explanation for her findings. In fact, her notes cite other medical records that indicated Plaintiff presented as well groomed, euthymic, and denying major symptoms with normal mood and affect, intact memory, judgment, and insight. (Tr. 558 & 562). The ALJ points to similar reasons for discounting the opinions of Dr. Brister and Dr. Logan. Dr. Brister's evaluation largely affirms Dr. Kuester's opinion while adding no new information as to Plaintiff's mental functioning. (Tr. 691–93). Dr. Logan's opinion also simply affirms the earlier findings as to Plaintiff's mental functioning. (Tr. 696).

Dr. Kuester's opinion is also inconsistent with other evidence in the record. Numerous normal mental status examinations consistently show that Plaintiff was functioning in a manner inconsistent with the limitations described by the agency consultants. (Tr. 305, 309, 355, 461, 538, 594, 641, 643–44, 647, 650, 653, 711, 742, 745, 748, 752, 756, 990, 995, 1000, 1312, 1336, 1344, 1347, 1362, 1365, 1369, 1412, 1444, 1912, 1919, 1929, and 1938). Further, Plaintiff's activities of daily living bely the agency consultants' opinions. Plaintiff reports that she prepares her own meals, does laundry and light cleaning, shops once a week, reads and knits (although joint pain limits her knitting), and reported working at her store and tutoring children throughout 2011, including after she left her job at the library. (Tr. 197–99, 293–95). The ALJ also specifically noted that Plaintiff claimed she could not use her hands despite evidence showing that she was still knitting in 2012. (Tr. 224). Plaintiff emphasizes evidence in which she indicated she was limited

11

in her abilities. But the ALJ has confronted that evidence with contradictory reports. The Court will not second guess the ALJ's reasoned and supported conclusions.

Plaintiff also takes issue with the ALJ's rejection of Dr. Darken's letter. Dr. Darken wrote a letter to Plaintiff's judge to explain the common side effects of the medications Plaintiff was taking to control her RLS. (Tr. 932–33). After reviewing Dr. Darken's letter, the ALJ concluded that there is some evidence to support Plaintiff's claim that her use of the RLS medications resulted in disabling symptoms. However, the ALJ noted that Plaintiff discontinued those medications in August 2011 and that Plaintiff was never actually diagnosed with an impulse disorder or anti-social disorder. Plaintiff now argues that the ALJ missed the point that the letter establishes, namely, that Plaintiff needed the medications before and after the onset date because she was suffering fatigue and concentration deficits due to sleep issues resulting from her RLS. Plaintiff makes a fair point, but as has already been discussed, there is substantial evidence to support the ALJ's conclusion that Plaintiff's symptoms were not disabling either before or after the onset date.

Plaintiff also argues that the ALJ erred by not incorporating his findings regarding Plaintiff's mild limitation in concentration, persistence, and pace into the RFC. Plaintiff points out that other courts in this Circuit have found that mild limitations in concentration, persistence, and pace may limit an individual's ability to perform skilled work, such as work as a library director in Plaintiff's case. However, as discussed above, substantial evidence supports the ALJ's conclusion that Plaintiff's mental impairments, including her mild limitations in concentration, persistence, and pace, would not prevent

12

her from performing skilled work as a library director.

Finally, Plaintiff argues that the ALJ failed to recognize that the cumulative effect of Plaintiff's mental and physical impairments prevent her from working for forty hours per week, even if she could perform the activities in the RFC for shorter periods of time. However, Plaintiff fails to point to any expert opinion in the record suggesting that she is unable to sustain a 40-hour workweek because of a severe impairment. And contrary to Plaintiff's arguments, the ALJ did consider Plaintiff's pain, sleepiness, and depressive symptoms. The ALJ reviewed medical records that indicated Plaintiff's insomnia and sleepiness had improved, although her sleepiness worsened in 2016. (Tr. 403, 576, 871, 892, 900–01, 1414–15, 1430, 1434, 1438, 1446, 1451). In addition to the activities of daily living and consistently normal objective exam findings discussed above, in 2013 Plaintiff also reported working at her cousin's newspapers two days a week after her disability onset date, although she reported in 2016 that she was no longer regularly working at the newspaper due to her pain. (Tr. 838, 1414). She also reported that moderate activity was best for her pain. (Tr. 1409). The ALJ relied on this fact to support his conclusion that a limitation to sedentary work accommodated Plaintiff's condition. Plaintiff clearly has limitations due to her pain and other symptoms. However, there is substantial evidence supporting the ALJ's conclusion that the RFC limiting Plaintiff to sedentary work adequately accounts for those limitations.

**B.     Subjective Symptom Analysis**

In Plaintiff's second set of arguments, she asks the Court to consider numerous details of the medical record and her subjective symptom complaints. However, it is the

Court's responsibility to determine whether the ALJ's conclusions were reasoned and supported by substantial evidence, not to reweigh the evidence. *Elder*, 529 F.3d at 413. Therefore, the Court will only consider the specific ways in which Plaintiff argues the ALJ's conclusions were not adequately reasoned and supported by substantial evidence.

First, Plaintiff takes issue with the point the ALJ made several times that many of Plaintiff's conditions and symptoms preexisted her disability onset date. Plaintiff argues that the ALJ ignored the fact that new conditions developed after the onset date and the existing conditions worsened. This argument might hold water if the ALJ had considered only medical evidence from before the onset date. But the ALJ's decision thoroughly evaluates the medical evidence from before and after the disability onset date.

Next, Plaintiff cites *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 621 (7th Cir. 2010), to argue that the ALJ erred by not discussing a few specific medical treatments Plaintiff received including some injections, medication adjustment, and hand pain. However, the ALJ did discuss Plaintiff's hand pain, medication adjustment, and injections. (Tr. 2107–08, 2113–17). Further, *O'Connor-Spinner* critiqued an ALJ's failure to explain his rejection of a reviewing psychologist's moderate limitation in an area that the Court found would have had a significant effect on the plaintiff's ability to work. Plaintiff has not shown that these specific bits of evidence have a similar weight in her case.

Plaintiff also makes several appropriate critiques of the ALJ's reliance on the evidence that Plaintiff worked at a newspaper after the disability onset date. Plaintiff points out that the evidence shows she worked only part time, at most. Further, the newspaper was owned by her cousin, and she testified that she could come and go when

14

she pleased. "Part-time work is not good evidence of ability to engage in full-time employment," especially when the employee receives some type of preferential treatment. *Vanprooyen v. Berryhill*, 864 F.3d 567, 571 (7th Cir. 2017). However, the fact remains that Plaintiff was clearly able to do some work after the disability onset date. And the ALJ made clear that he did not rely on this evidence alone to find that Plaintiff could return to past work. (Tr. 2117). Rather, the ALJ relied on Plaintiff's work at the newspaper as one fact among others which tended to show that Plaintiff's pain and other symptoms were not as debilitating as she claimed. Specifically, the ALJ found that Plaintiff's work at the newspaper called into question her testimony that she could walk for only 5–10 minutes at a time, could sit for only 15–20 minutes at a time, and reclined 5–6 hours per day. (Tr. 1689–90, 1701, 2117).

Plaintiff concludes her second set of arguments with a final salvo of references to the medical record indicating that she continues to suffer from flares of RA, sleepiness, and pain in her hands. Plaintiff's claims are supported by the record. But as discussed above, the ALJ relied on evidence in the record indicating that Plaintiff's insomnia had improved, that her sleepiness improved at times, that she could work with her hands as evidenced by some knitting, her work at the newspaper, and her assertion that a moderate amount of activity was actually best for her joint pain. Thus, the Court concludes that the ALJ's findings as to these alleged limitations and symptoms were reasoned and supported by substantial evidence.

C.     **Stale State Agency Opinions**

Finally, Plaintiff takes issue with the ALJ giving some weight to the agency

medical consultants because a portion of the medical record was submitted after these consultants offered their evaluation. However, the ALJ does not appear to have relied on these opinions to any significant extent. In fact, the ALJ acknowledges that their opinions only considered a brief period of evidence, and he accordingly spends little time considering them. (Tr. 2119). Thus, any error in the ALJ's brief treatment of these opinions was harmless.

## Conclusion

After careful review of the record as a whole, the Court is convinced that the ALJ's findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying Plaintiff's application for disability benefits is **AFFIRMED**.

The Clerk of Court is directed to enter judgment in favor of Defendant.

**SO ORDERED.**

Dated: May 17, 2022

DAVID W. DUGAN
United States District Judge